R. M. C. Corporation, Appellant, v. Genco, Inc., Louis W. Gensburg, Meyer Gensburg and David Gensburg, Appellees.

Gen. No. 43,572.

Opinion filed December 31, 1946. Rehearing denied January 14, 1947. Released for publication January 15, 1947.

McInerney, Epstein & Arvey, of Chicago, for appellant; Louis M. Mantynband and George L. Siegel, both of Chicago, of counsel.

JACOB G. GROSSBERG, of Chicago, for appellees.

MR. JUSTICE SCANLAN delivered the opinion of the court.

On April 16, 1934, plaintiff, then known as Rock-Ola Manufacturing Corporation, filed its complaint against Genco, Inc., a corporation, and Louis W. Gensburg, Meyer Gensburg and David Gensburg, its officers, who owned the entire stock of the corporation, which pleading alleged that plaintiff manufactured certain pin-games simulating baseball and called "World Series"; that thereafter defendants manufactured a pin-game simulating baseball called "Official Baseball"; that defendants' game and the advertising thereof constituted unfair competition under the National Recovery Act of 1934 and at common law. The complaint sought a temporary injunction to restrain the manufacture and advertising of defendants' game. After a hearing a temporary injunction was entered, on April 27, 1934, restraining defendants

"1. From selling the machine called 'Official Baseball' through the means of advertisement or written statements heretofore published by them;

"2. From selling, distributing or delivering any of said machines on orders heretofore received by them, or renewals of such orders, by reason of such unfair competition and such advertising and publication;

"3. From advertising or publishing, either directly or indirectly, in any manner, the manufacture, sale or distribution of said machine as at present constituted or with any changes therein which do not substantially affect its present form. *Nothing in this clause contained shall prohibit the manufacture, sale and distribution of said machine without the advertising and publication hereby restrained.*" (Italics ours.)

Not until April 4, *1935,* was a motion to dissolve the temporary injunction filed. This motion was not

pressed. On June 13, 1935, a final decree was entered, which decreed "that the temporary injunction heretofore issued by this Court be and the same is hereby made permanent and perpetual." Defendants prosecuted an appeal to this court and while the cause was pending here the National Recovery Act was held unconstitutional (*Schechter v. U. S.,* 295 U. S. 495) and plaintiff then abandoned the charge that defendants violated the said Act, and we were called upon to determine only one question, viz: Were the defendants guilty of unfair competition at common law? On February 9, 1937, we reversed the decree of the trial court and our mandate provided: "Decree reversed, and cause remanded with directions to dismiss plaintiff's complaint for want of equity, at plaintiff's costs, that court [Superior court of Cook county] retaining jurisdiction for the assessment of damages for the wrongful issuance of the preliminary and permanent injunctions." Thereafter the trial court dismissed the complaint and on March 4, 1938, defendants filed a suggestion of damages, in which they claimed that as the result of the temporary and permanent injunctions they suffered the following damages: $25,000 for attorneys' fees, $25,000 for expenses of witnesses and documentary evidence, and $450,000 for loss of profits. Plaintiff's motion to strike the suggestion of damages was overruled and after plaintiff filed an answer denying the allegations in defendants' suggestion of damages, the cause was referred to a master in chancery and a very lengthy hearing was had before that officer. He filed a report in which he found that the equities were with defendants, that they were entitled to the relief prayed for in their suggestion of damages, and he made the following recommendations: That a decree be entered in conformity with his findings of fact and conclusions of law, "assessing damages against the plaintiff in the sum of $104,334.00, and in favor of

the defendants by reason of the wrongful issuance of the preliminary and permanent injunctions, to-wit:

"1. The sum of $90,580.00 for loss of profits on sales of 'Official Base Ball' games which defendants would have derived, received and enjoyed except for said preliminary and permanent injunctions;

"2. The sum of $12,750.00 expended by defendants for solicitors' fees and charges in and about procuring the dissolution of said injunctions;

"3. The sum of $1004.00 paid by defendants for taking and transcribing the testimony of witnesses at the hearings in the original proceedings, in and about procuring the dissolution of said injunctions."

Plaintiff appeals from a decree that followed the recommendations of the master.

Defendants have filed a cross-appeal in which they contend that the damages assessed by the master and confirmed by the trial court were inadequate and that if there is a reversal and remandment of this case it should be with directions to assess defendants' damages in an amount "between $150,000 and $500,000."

Upon the former appeal we reversed and remanded the decree with directions to the trial court "to dismiss plaintiff's complaint for want of equity, at plaintiff's costs, *that court retaining jurisdiction for the assessment of damages for the wrongful issuance of the preliminary and permanent injunctions.*" The foregoing italicized words were inadvertently and improperly used in our judgment order. We will later in this opinion refer to this matter.

Plaintiff contends that damages may be allowed only on the dissolution of a temporary injunction; that under Section 12 of the Injunction Act, upon a suggestion of damages, the court at most can allow only such damages as were necessarily incurred in procuring a dissolution of a temporary injunction, but it cannot allow damages that are sustained in the general defense of the suit. The only authority for the assessment of damages upon the dissolution of an injunction

is Section 12 of the Injunction Act (Ill. Rev. Stat. 1943, Ch. 69, Par. 12 [Jones Ill. Stats. Ann. 109.360]), which reads as follows:

"In all cases where an injunction is dissolved by any court of chancery in this state, the court, after dissolving such injunction, and before finally disposing of the suit, upon the party claiming damages by reason of such injunction suggesting, in writing, the nature and amount thereof, shall hear evidence and assess such damages as the nature of the case may require, and to equity appertain, to the party damnified by such injunction, and may award execution to collect the same: Provided, a failure so to assess damages shall not operate as a bar to an action upon the injunction bond."

In *Milligan v. Nelson,* 188 Ill. 139, 141, the court said: ■ "It is well settled in this State that, on suggestions, damages will not be allowed for services rendered in the general defense of the suit, but only such as have been incurred for the purpose of getting rid of an injunction on a motion to dissolve, and not upon final hearing. In *Jevne v. Osgood,* 57 Ill. 340, on page 346 we say: 'The design of the statute is not that the defendant shall, where the injunction is dissolved, recover his attorney's fees for all that has been or may be done in the case. To give the statute such an unreasonable construction would render it an instrument of great oppression. It was only intended to reimburse the defendant for moneys which he has paid or for which he has become liable on the motion to dissolve.' And in *Elder v. Sabin,* 66 Ill. 126, on page 131: 'The statute only allows the assessment of damages sustained by reason of improperly suing out the injunction, and the damages must be confined alone to that ground. The charge for lawyer's fees could only extend to the motion to dissolve the injunction.' "

■ In *Chicago Title & Tr. Co. v. De Lasaux,* 336 Ill. 522, 529, 530, the court stated: "This section [Section 12] is only applicable where preliminary injunc-

tions are issued and has no application to permanent injunctions entered upon a final hearing, where there can be no motion to dissolve.'' In *Nestor Johnson Mfg. Co. v. Goldblatt,* 371 Ill. 570, the court again states that Section 12 of the Injunction Act relates only to temporary injunctions. But the astute counsel for defendants seeks to evade this settled law by contending that the doctrine of *res judicata* precludes plaintiff from raising the instant contention. The counsel bases his contention upon the words in our judgment order upon the former appeal which we have heretofore cited and italicized. The question of the damages, if any, that defendants were entitled to by reason of the temporary injunction was not involved in the former appeal, as the counsel well knows. As we stated in the opinion filed upon the former appeal, the sole question that we were called upon to decide was whether the defendants were guilty of unfair competition at common law. The brief filed by defendants presented a single point, viz., that the evidence failed to make out even a *prima facie* case of unfair competition. The counsel now contends, in effect, that we should rule contrary to the established law because of the words we inadvertently used in the remanding order upon the former appeal. Defendants' right to file a suggestion of damages, if they had such right, arose solely from the statute (Section 12) and not from our former judgment order. Section 12 gives jurisdiction to the trial court to entertain a suggestion of damages and also prescribes the procedure to be followed. When our judgment order reversed the decree that was before us upon the former appeal it should have stopped there. A judgment must be read as applicable only to the facts involved, and is authority only for what is actually decided. (See *Estate of Tilliski,* 390 Ill. 273, 285.) The contention of defendants that the subject matter of plaintiff's contention is *res judicata* is without merit. Plaintiff strenuously

contends that under Section 12 damages may be allowed only upon the dissolution of a temporary injunction upon motion; that in the instant case the temporary injunction was never dissolved but "became *functus officio* upon the entry of the permanent injunction"; that Section 12 has no applicability to permanent injunctions entered upon a final hearing, where there can be no motion to dissolve, citing *Chicago Title & Tr. Co. v. De Lasaux, supra,* and *Nestor Johnson Mfg. Co. v. Goldblatt, supra.* Defendants did not file a motion to dissolve the temporary injunction until April 4, 1935, which was nearly a year after the entry of that injunction and after the case had been heard by the master, and this motion was never pressed and no order was entered in reference thereto. Defendants' answer to plaintiff's instant contention is that while defendants' motion to dissolve the temporary injunction was pending the lower court entered a judgment of permanent injunction, which judgment, in effect, "*meant the overruling of the pending motion to dissolve.*" (Italics ours.) To this answer plaintiff responds that the entry of a permanent injunction is not inconsistent with a motion to dissolve a temporary injunction and that it was held in *Nestor Johnson Mfg. Co. v. Goldblatt, supra,* that a temporary injunction may properly issue even though a permanent injunction is later denied, and that it was held in *Schuler v. Wolf,* 372 Ill. 386, that a temporary injunction may wrongfully issue even though a permanent injunction later issues; that a temporary injunction serves merely to maintain the *status quo* pending litigation, and that its validity is not dependent on the granting or failure to grant a permanent injunction. The permanent injunctional order entered June 13, 1935, decreed "that the temporary injunction heretofore issued by this Court be and the same is hereby made permanent and perpetual." Defendants argue that the permanent injunctional order "meant the overruling of the pend-

ing motion to dissolve," and that therefore defendants had the right to file their suggestion of damages, but Section 12 provides: "In all cases *where an injunction is dissolved* by any court of chancery in this state, the court, *after dissolving such injunction, and before finally disposing of the suit,* upon the party claiming damages by reason of such injunction suggesting, in writing, the nature and amount thereof, shall hear evidence and assess such damages as the nature of the case may require. . ." No such situation was present in the instant case. It will be noted that the suggestion of damages was not filed until nearly three years after the entry of the permanent injunction. Section 12 specifically provides that damages may be allowed only upon a dissolution of a temporary injunction and before final disposition of the suit, and under the instant record the motion of plaintiff to strike defendants' suggestion of damages should have been allowed. However, if it could be assumed, for the purposes of this appeal, that defendants had the right to file a suggestion of damages, the exercise of such right would, in our judgment, avail defendants nothing, as we are satisfied that plaintiff's contention that defendants suffered no damages because of the temporary injunction, is fully supported by the evidence.

Plaintiff asserts: "Defendants have failed to establish that any of the orders received were lost because of the injunction. Defendants have failed to establish that any prospective orders were lost. Business operations continued as usual after the injunction. The old customers were served, as well as new customers. Many more orders were received after the injunction than prior to the injunction. More games were shipped subsequent to the injunction than prior thereto. Genco continued to manufacture at full capacity and was unable to manufacture a sufficient number of games to fill all orders. Genco received orders after the injunction for 10,567 games, but was unable

to manufacture and ship more than 2,048. So that even if additional orders had been obtained, Genco would have been unable to fill them. The injunction did not prohibit Genco from increasing its production but expressly permitted the manufacture, distribution and sale of the game. Genco's experience with Official Baseball was no different than its experience with other games not affected by the injunction." Plaintiff calls attention to the fact that in its brief it challenged defendants to point out any specific orders that were lost because of the injunction, and that defendants in their brief fail to point out any such orders.

It has been the law of this State since the case of *Collins v. Sinclair*, 51 Ill. 328, that upon a suggestion of damages upon the dissolution of an injunction the assessment should rest upon equitable grounds and should not exceed the damages actually sustained. Plaintiff contends that neither the master nor the chancellor observed this rule in the instant case. Defendants argue that "the damages sought and assessed in this case are neither speculative nor contingent, and only uncertain in the sense that the loss in question cannot be estimated with precision, but may be estimated with some approximation. And one way to estimate them is by the opinion of qualified witnesses," and that "damages may be measured by the most liberal scale." In *Landis v. Wolf*, 206 Ill. 392, 399, it is stated that it is well settled that "damages, which are remote, speculative and incapable of ascertainment cannot be allowed." In the instant case the chancellor, in deciding the exceptions to the master's report, stated: "In this case, it was not too easy to figure damages"; that "he [the master] has allowed, and we are permitted to assess, damages without being able to prove every item"; that "the overall picture of what happened here would justify damages, and probably the law would, in this type of a case, allow, as Mr. Grossberg [attorney for defendants] claims, liberal

damages. I think that is correct." Plaintiff insists that the uncertain and speculative nature of defendants' claim for damages is demonstrated by the following statement made by their able and experienced attorney at the conclusion of defendants' brief: "We submit that if there is a reversal in this case, it should be with directions to assess damages in accordance with the undisputed evidence *in an amount between $150,000 and $500,000.*"

Plaintiff and defendants manufactured "Pin Games," also known as novelty games, used "for the amusement of the public." Their popularity is of short duration, usually lasting from sixty to ninety days. William Gersh, called by defendants as an expert, testified that "the product dies too fast. By that I mean that generally any product in this industry has a short life due to the fickleness of the public. . . . In short they play the game for a week, two weeks, three weeks, four weeks and sometimes as high as eight weeks and then it is all over. It has to be moved away and sold off as a used game, or sent to small towns, discarded, broken up, traded, and new games enter in the market constantly for that reason." The games are not sold to the general public but are sold primarily to distributors, who in turn sell to operators. Defendant corporation had an authorized capital stock of $5,000, $3,000 of which was paid in. The total amount invested in the business did not exceed $25,000. Defendants had their plant and office in a one-story brick building and maintained a force that varied between seventy-five and one hundred and twenty-five employees. The master found that defendants' plant, in 1934, had a production capacity of one hundred games in an eight hour day. While the master also found—what amounts to a self-evident fact—that they could have produced more games if they had worked an extra eight-hour shift, the uncontroverted evidence is that they never operated more than eight hours a day prior to or after

the injunction. Defendants advertised Official Baseball in several periodicals for a month prior to the injunction and the evidence shows that first advertisements are the most important ones. The last advertisement shown by the record was on May 7, 1934. On March 28, 1934, the defendant corporation sent to its customers a letter announcing the production of Official Baseball, the prices and dates of delivery. After the injunction defendants continued to produce their customary number of games. They claim that on the day that the injunction was issued they canceled all unfilled orders by writing the word "void" thereon. On the same day they sent to their distributors the following letter:

"We wish to advise that a temporary injunction has been entered restraining us from advertising the Genco Official Baseball machine, from filling any orders obtained as a result of our past advertising of this game and from filling any reorders based upon our past advertising of this game.

"We are, therefore, cancelling your orders for all Genco Official Baseball machines, received prior to and including today.

"We are also enclosing an affidavit, which if true and you can honestly sign and have same notarized, and return to us in duplicate, we can then immediately fill any new orders you may send us, provided that these orders are in nowise induced by any advertising on this game."

The salient part of the said affidavit was the statement that in purchasing the machines the affiant was in nowise induced to make the purchase by any advertising. It is conceded that practically all of the distributors answered the letter and forwarded with their answer a signed affidavit in accordance with defendants' request. Plaintiff contends that the record fails to show that any distributor who received a letter refused to sign the affidavit. Upon the receipt of a

signed affidavit from a distributor defendants reinstated the order that had been canceled. So far as we have been able to ascertain from the record there is no proof that a single order that was on hand at the time of the issuance of the injunction was lost by reason of the injunction. Defendants started to manufacture the game in question about March 1, 1934, and the first order was received on March 27, 1934. During the months of March, April and May, 1934, *which period covers the lifetime of the game in question,* defendants produced 2,362 games, 2,773 games and 2,288 games, respectively. Defendants were then manufacturing the game in question and other games, and these figures include all games that they manufactured. The evidence tends to show that defendants were manufacturing to full capacity before and after the injunction. 3,281 games were ordered prior to the injunction. Plaintiff calls attention to the proof that defendants received orders for 10,567 games after the injunction. Defendants contend, rightfully we think, that this figure includes orders that were canceled by defendants after the injunction was entered and that were reinstated after the distributors had sent in the affidavits requested. The master found that 1,904 games were canceled after the injunction was entered, but certain evidence introduced by defendants shows that only 1,687 games were canceled, and the cross-examination of Mrs. Gendron tends to show that not all of the 1,687 games were in fact canceled by reason of the injunction. However, if we assume the correctness of the master's findings, it appears that 8,663 games were ordered after the injunction. We find from evidence given by certain of defendants' witnesses and from documents introduced by defendants the following facts: That during the short life of the game in question defendants were manufacturing to their full capacity; that after the entry of the injunction defendants had so many orders on hand that they could not

fill them; that orders were canceled or remained unfilled because defendants were unable to manufacture sufficient machines to meet the orders; that defendants did not have enough machines to fill the orders as they came in; that orders were "broken up" for shipment —that is, if an order called for fifty games they would make two ten-lot shipments and one five-lot shipment and would hold twenty-five games of the order because they did not have "the 25 machines to ship"; defendants were compelled to "ration" games among their customers; that numerous orders were canceled or remained unfilled because defendants could not produce a sufficient number of machines to fill the orders; that sometimes the orders were so far beyond defendants' capacity to produce that they were not even "transcribed to order memoranda." One of defendants' witnesses testified that a certain large order was not entered upon the books "for the simple reason that by the time you got the last machine made up, it would have been an obsolete number."

The master found that 3,700 games represented by "standing orders" were lost because of the injunction. A "standing order" was defined by defendants as an order for a certain number of games per day, week or month for an indefinite period. A customer had the right to cancel such an order at any time. The master found that at the time of the injunction defendants had on hand the following standing orders:

| "Names of Customers | Standing Orders |
|---|---|
| "Automatic Amusement Company and its subsidiaries.............. | 5,000 |
| "Eastern Machine.................. | 66 |
| "Fitzgibbons ..................... | 60 |
| "Supreme Vending Company........ | 375 |
| Total: | 5,501" |

He further found that 1,801 games were delivered upon said standing orders and that 3,700 games were

lost because of the "injunctions." Plaintiff strenuously contends that the evidence conclusively shows that this "standing order" of Automatic Amusement Company and its subsidiaries for 5,000 games was not a *bona fide* one. As the master found, the Automatic Amusement Company and its subsidiaries was defendants' largest distributor and "was the outlet for from thirty to forty per cent. of 'Official Base Ball' games actually sold and delivered." The owner of the company was S. L. Stanley, who testified (by deposition) that on April 21, 1934 (six days before the entry of the temporary injunction), David Gensburg, one of the defendants, told him that plaintiff was attempting to enjoin him from the manufacture of Official Baseballs but that if he could show that he had enough orders on hand and would be seriously damaged if he were compelled to discontinue the manufacture of that machine he felt that he would not have to discontinue its manufacture and that he wanted Stanley to send him (Gensburg) an order for 5,000 machines but that Stanley would be under no obligation to accept the machines; that Gensburg instructed him to send in the order under date of April 5. Stanley further testified that he would not have sent in the order without the understanding that he was under no obligation to take the machines unless he had actual sales for them; that he sent Gensburg the requested order, together with a letter, also dated April 5, although the order and the letter were written on April 21; that in said conversation he told Gensburg that he did not see much use in giving the order because defendants had not been able to fill his previous orders; that Gensburg told him that the order was for the definite purpose of being able to continue the production of the machines. Stanley further testified that if no injunction had been entered he could not have used 5,000 games in his territory. This order for 5,000 games was not offered in evidence by defendants and they never made any memorandum

of the order. Defendants' evidence shows that the failure to enter the order upon their books was due solely to the fact that defendants would be unable to manufacture a sufficient number of games to fill such an order before the game would be an "obsolete number." Although Stanley testified by deposition, the master found that he manifested a marked prejudice in favor of plaintiff. The master seems to have ignored the important fact that Gensburg, who was present at the hearing and testified, did not deny the testimony of Stanley, and the master overlooked the fact that no entry of the alleged order was ever made upon defendants' books. The contention of plaintiff that defendants' claim that they had a standing order of 5,000 machines from Stanley was a mere afterthought and part of a scheme for building up orders that were not *bona fide,* is fully justified by the evidence. It must be noted that Gensburg's purpose in having Stanley send the order for 5,000 games was to use the order in the proceedings before the chancellor upon plaintiff's motion for a preliminary injunction. It is a reasonable presumption that this very large order was used by defendants upon that hearing, and it is significant that the chancellor, in passing upon the said motion, after a hearing, refused to enjoin defendants from manufacturing the game. On April 30, 1934, Stanley sent to defendants the affidavit that Gensburg had requested, and in his letter he stated that he had received notice from defendants that on April 27, 1934, they had canceled any orders of Stanley that they then had on hand and that he had placed a new order with defendants for 3,000 Genco Official Baseball machines. Defendants shipped only 361 games upon this last order, although subsidiaries of Stanley complained bitterly to defendants of their failure to deliver the machines called for by the order. We hold that the Stanley order for 5,000 games was not a *bona fide* order. As to the finding of the master that defendants had a

standing order for 66 machines from Eastern Machine: Plaintiff contends that there is absolutely nothing in the record to prove that there was such a standing order, and it challenged defendants to point out anything in the record that would sustain this finding of the master. We find no answer in defendants' brief to this challenge, and we are, therefore, justified in assuming that plaintiff's contention as to the Eastern Machine standing order is a meritorious one. We may say, however, that there is in evidence what purports to be a pencil memorandum dated April 3, 1934, to ship three games daily to Eastern Machine Exchange, but there is no evidence that any communication from Eastern Machine Exchange in reference to such an order was received by defendants, and there is no competent evidence to show that the pencil memorandum was an authorized *bona fide* order. Mrs. Gendron testified that she did not write up an order memorandum for three games daily for Eastern Machine Exchange because they were unable to ship three machines daily to that company. As to the finding of the master that there was a standing order of Fitzgibbons for 60 games and a standing order of Supreme Vending Company for 375 games, plaintiff contends that the evidence shows that defendants delivered 116 games to Fitzgibbons and 563 games to Supreme Vending Company, and defendants therefore lost nothing by reason of the said standing orders. Defendants fail to answer this contention of plaintiff. The master's report sustains it.

We find that defendants suffered no damages arising from so-called "standing orders."

The master found that defendants lost many prospective orders as a result of the injunction. Plaintiff contends that witnesses were permitted to give estimates of probable sales, were allowed to give testimony that was based upon hearsay, and were allowed to testify as to contents of books and records without the production of such books or records for verifica-

tion and inspection; that so-called experts were permitted to give their opinion as to prospective profits lost by defendants by reason of the injunction without stating the facts upon which the opinions were based; that the estimates of these witnesses involved alleged profits that were speculative and uncertain. Plaintiff's contention that the master admitted incompetent evidence is not without some merit, but we do not deem it necessary to pass upon the specific objections urged to certain evidence for the reason that as we read this record defendants received orders for more games than they were able to manufacture during the short life of the game in question and therefore, if it be assumed that defendants would have received additional orders had it not been for the injunction, they would not have been able to fill such orders within the lifetime of the game. The master seemed to recognize this weakness in defendants' claim because he states in his opinion that additional games could have been produced by putting on an extra eight hour shift for thirty work days and that labor and materials were low in 1934. The temporary injunction order specifically provided that "nothing in this clause contained shall prohibit the manufacture, sale and distribution of said machine without the advertising and publication hereby restrained," and the letter sent by defendants to their distributors immediately after the entry of the injunction shows that they understood the purpose and effect of the injunction. Moreover, the evidence shows conclusively that neither before nor after the entry of the injunction did defendants put on an extra shift. The master seeks to excuse this failure by assuming that defendants were embarrassed in the conduct of their business by the temporary injunction, but it is clear from the said letter, and from other circumstances, that they fully understood their rights under the injunction. The contention of plaintiff that the chancellor erred in following the recommendation of the master that defendants were entitled to dam-

ages for the loss of prospective orders, is sustained.

 Plaintiff contends that the chancellor erred in assessing damages against plaintiff for $12,750, alleged to have been expended by defendants for solicitors' fees and charges in and about procuring the dissolution of the temporary injunction and permanent injunction; that the court, at most, could allow only such attorneys' fees as were necessarily incurred in procuring a dissolution of the temporary injunction but not for services rendered in the general defense of the suit; that the attorneys' fee allowed for damages is almost entirely for services rendered in the trial of the case in chief and upon the appeal from the final decree; that defendants have not differentiated in their proof between legal services which were strictly necessary to procure a dissolution of the injunction—if it be assumed that they procured a dissolution—and services rendered in the case generally, and that, therefore, there is no evidence upon which an assessment of damages for services rendered in the matter of the temporary injunction can be based, and that the allowance of damages in the instant case for counsel's fees must be disallowed *in toto*. *Landis v. Wolf, supra; Lambert v. Alcorn,* 144 Ill. 313, and *Nestor Johnson Mfg. Co. v. Goldblatt, supra,* cited by plaintiff, sustain this contention. Defendants, in support of their contention that the fees allowed must be sustained, rely upon the point that the doctrine of *res judicata* precludes plaintiff from raising the instant contention. We have heretofore disposed of that point and adversely to defendants' position.

From what we have heretofore stated in this opinion it follows that there is no merit in the cross-appeal of defendants.

We are satisfied, after a patient consideration of the evidence, that defendants suffered no loss of profits nor were they damaged because of the issuance of the temporary injunction.

The decree of the Superior court of Cook county entered June 20, 1945, is reversed *in toto*. The cross-appeal of defendants is dismissed for want of equity.

*Decree entered June 20, 1945, reversed in toto. Cross-appeal dismissed for want of equity.*

SULLIVAN, P. J., and FRIEND, J., concur.